**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| PETER NAHACZEWSKI, | |
| Plaintiff, | Civil Action No. 20-1241 (SDW) (LDW) |
| v. | **OPINION** |
| BUCK GLOBAL, LLC, | |
| Defendant. | July 26, 2022 |

**WIGENTON**, District Judge.

Before this Court is Defendant Buck Global, LLC's ("Defendant") Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56. Jurisdiction is proper pursuant to 28 U.S.C. §§ 1332(a) and 1367. Venue is proper pursuant to 28 U.S.C. § 1391(b). This opinion is issued without oral argument pursuant to Rule 78. For the reasons stated herein, Defendant's Motion is **GRANTED**.

1

I.  **FACTUAL AND PROCEDURAL HISTORY**[1]

This lawsuit arises from Plaintiff Peter Nahaczewski's ("Plaintiff") age discrimination claim against his former employer. Plaintiff, a 65-year-old man at the time of the alleged incident giving rise to this action, worked for Defendant as a Client Manager from August 2015 until his termination in October 2019. (D.E. 50-1 ¶¶ 3, 128.) Defendant is a Limited Liability Company ("LLC") that provides professional services, including consulting, administration, and technology services, to various institutional clients. (*Id.* ¶ 1; D.E. 1-1 ¶ 2.) The following events preceded the instant suit.

A.  **Plaintiff's Employment History with Defendant**

Plaintiff was hired by Buck Consultants ("Buck"), a predecessor entity of Defendant's current company. (*See* D.E. 50-1 ¶ 3.) Buck Consultants had previously been called Conduent HR Services, which was owned by then-parent company Conduent, Inc. (*Id.* ¶ 14.) In August 2018, Conduent, Inc. sold Conduent HR Services to H.I.G. Capital, Conduent HR Services became Buck, and the new entity was informally referred to by employees as "New Buck." (*Id.* ¶¶ 16–17.)

During the term of employment at issue, Plaintiff worked for Buck as a Client Manager, which is also known as a Senior Account Manager. (*Id.* ¶ 10.) Client Managers are tasked with developing relationships with certain clients and working closely with Subject Matter Experts ("SMEs") to deliver services to clients. (*Id.* ¶ 11.) Plaintiff initially reported to Mark Gray, then

---

[1] Record citations in this opinion are generally to the parties' motion papers, including briefs, affidavits, declarations, and Defendant's Statement of Material Facts Not in Dispute ("Defendant's Statement"), (D.E. 44-77), Plaintiff's Response to Defendant's Statement of Undisputed Material Facts ("Plaintiff's Response"), (D.E. 48-40), Defendant's Reply Statement of Material Facts ("Defendant's Reply"), (D.E. 50-1), and Plaintiff's Supplemental Statement of Undisputed Material Facts ("Plaintiff's Supplement"), (D.E. 48-41), as well as the record citations contained therein. Because Defendant's Reply accurately presents all of the information provided by Defendant's Statement and Plaintiff's Response, most citations will reference that document, rather than referencing the separate documents.

in 2016 he reported to Tom Lutz, and in 2017 he reported to Jon Baeta. (*See id.* ¶¶ 6, 7, 9.) After the company transitioned to New Buck in August 2018, Plaintiff worked as one of approximately ten Client Managers that Defendant employed. (*Id.* ¶ 19.) At that time, Plaintiff was 64 years old, and two other Client Managers were older—one 66 years old, and one 67 years old. (*Id.* ¶ 20.) The transition prompted organizational changes. (*Id.* ¶ 21.) John Baeta became a Regional Managing Director ("RMD") for another division, and Plaintiff began to report to RMD Patricia Gibney, who was 60 years old at the time.[2] (*Id.* ¶¶ 22–24.) Gibney reported to Dean Aloise, who oversaw Buck's operations in the U.S. and sought to ensure that managers were "enhancing and enforcing performance standards, recruiting and retaining high performers, and creating an exit plan for poor performers." (*Id.* ¶¶ 26, 31.)

In March 2019, Gibney conducted an evaluation of Plaintiff's 2018 job performance,[3] in which she considered his performance herself; sought feedback from other employees and Plaintiff's former manager, Baeta; and had Plaintiff submit an evaluation of his own performance. (*Id.* ¶ 39.) Other employees, including several SMEs that Plaintiff worked with, provided feedback to Gibney via email, which including the following: (1) "Plaintiff 'was quick to begin talking about a Buck solution he really knew nothing about and seemed to make the situation worse'"; (2) "I do not think [Plaintiff] knows our business deeply. . . . He has had no real impact on the business we have with [Client]"; (3) "I'm not sure that if [Plaintiff] wasn't there if it would make any difference"; and (4) "Plaintiff's '[k]nowledge of our product offerings is sometimes thin. Doesn't necessarily match products and services to client situation.'" (*Id.* ¶¶ 43–44.) Baeta also weighed

---

[2] As an RMD, Gibney's responsibilities included managing "operations, financial results, talent acquisition and retention, and client satisfaction in the northeast region." (*Id.* ¶ 25.)

[3] The performance rating system Defendant used graded employees on a scale of one (lowest) through three (highest). (*Id.* ¶ 40.)

3

in on Plaintiff's performance and "observed that Plaintiff would often miss deadlines, lacked intelligent understanding of Buck's business and product offerings, missed or showed up late for calls and meetings, was unable to anticipate and fill client needs, and failed to establish trust and credibility with his colleagues." (*Id.* ¶ 47.) After having difficulty entering his self-assessment in the computer system, Plaintiff completed the assessment in which he "added some minimal text on top of an existing document containing his prior year's performance goals." (*Id.* ¶ 48; D.E. 48-29 ¶ 17.) After Gibney considered the feedback she received from other employees and Plaintiff, factored in her own assessment, and contacted Buck's Director of Human Resources, Karen Tancredi to discuss the assessment, Gibney rated Plaintiff's performance "1.5 for 2018, which translates to 'Below Expectations—performs below expectations in several areas.'"[4] (D.E. 50-1 ¶¶ 49–54.) While that rating typically precludes an employee from receiving a bonus, Plaintiff did ultimately receive one. (*Id.* ¶¶ 50, 55.)

On March 24, 2019, Plaintiff turned 65 years old. (D.E. 48-29 ¶ 19; D.E. 50-1 ¶ 136.) Prior to his birthday, Plaintiff asserts that he requested time off and mentioned to Gibney that "'it was a special birthday because '[he] was turning 65 and [he] always take[s] the day off on [his] birthday.'" (D.E. 48-29 ¶ 19.) Plaintiff alleges that Gibney responded by asking, "Do you have any plans to retire?" (*Id.*) Plaintiff contends that he responded, "[N]o because I enjoy what I'm doing and make good money." (*Id.*) Plaintiff says Gibney indicated that she understood. (D.E. 50-1 ¶ 137.) Defendant observes that Plaintiff testified in a deposition that he entered the remark about taking time off for his birthday into the company's time-tracking software, and then Gibney and Plaintiff had a conversation about the entry, during which she asked if he was thinking about

---

[4] Plaintiff alleges that he did not receive a copy of the 2018 Performance Review at the time it was issued and thought, at the time, that he received a rating of 2. (D.E. 48-29 ¶ 18.)

4

retirement. (D.E. 50-1 ¶ 136.) There is, Defendant contends, no record of any such tracking entry around that date, and Plaintiff's birthday was on a Sunday, which Plaintiff would not need to take off. (*Id.* ¶ 150.) Gibney denies asking whether Plaintiff thought about retiring. (D.E. 50-1 ¶ 135.)

In April 2019, Gibney met with Plaintiff to discuss his performance review, and Plaintiff subsequently emailed Gibney to summarize the discussion. (*Id.* ¶ 57; D.E. 48-29 ¶ 23.) In the weeks following the review, Gibney reported that Plaintiff continued to struggle with job performance and multiple Buck employees complained to Gibney about Plaintiff's job performance. (D.E. 50-1 ¶¶ 60–64.) In early May 2019, Gibney emailed Aloise and told him that Plaintiff was "her only poor performer," but asked to "give him a chance to meet her expectations." (*Id.* ¶ 65.) Plaintiff notes that Gibney also said that "[Plaintiff was] clearly trying to improve, but at the same time *has made more than one comment about being near the end of his career and being comfortable with the status quo*." (D.E. 48-29 ¶ 21.) Plaintiff denies stating that to Gibney. (*Id.*) A few weeks after Gibney delivered Plaintiff's performance review, Plaintiff purportedly failed to prepare for and effectively execute a sales strategy during a meeting with an important client. (*Id.* ¶¶ 67–78.) Another Buck employee involved in the presentation sent a detailed email to Plaintiff criticizing his lack of preparation and "disappointing" execution during the meeting. (*Id.* ¶ 78.)

On May 22, 2019, Gibney met with Tancredi and drafted a "Performance Improvement Plan "(PIP") for Plaintiff, which outlined several key areas including

> (i) business basics (like responding timely to emails and performing assigned administrative tasks); . . . (ii) restoring the confidence of his SMEs . . . ; . . . (iii) understanding and being able to manage the sales documentation process; . . . (iv) managing accounts receivable for clients; . . . (v) fulfilling his core Client Manager duties by "play[ing] a meaningful role in selling, negotiating, and contracting [Buck's] services."

(*Id.* ¶¶ 81–83 (sixth and seventh alterations in original).)  Gibney delivered the PIP to Plaintiff on May 23, 2019, and reviewed the document with him.  (*Id.* ¶ 84; D.E. 48-29 ¶ 25.)  Gibney alleges that "Plaintiff asked if his job was in jeopardy," and she responded that "it was and that he needed to show improvement and a sustained acceptable level of performance against the PIP's goals."  (D.E. 50-1 ¶ 85.)

After Gibney delivered the PIP, Plaintiff submitted weekly written updates, Gibney and he discussed his progress weekly, and Gibney encouraged Plaintiff.  (*Id.* ¶ 89–90.)  Gibney noted that Plaintiff initially showed improvement in the "business basics portions of the PIP," but during a mid-year review in early August 2019, she noted several other areas in which Plaintiff still needed to improve.  (*Id.* ¶¶ 92–97.)  Gibney contacted Tancredi and reported that because Plaintiff had improved his business basics skills, "she was not recommending Plaintiff's termination at that time."  (*Id.* ¶¶ 99–100.)

In the months that followed, however, Gibney reported that Plaintiff's improvement waned, and he did not meet the expectations outlined in the PIP, including failing to "timely and effectively pursue past-due accounts receivable"; failing to "adequately prepare for an important call" with a client; failing to prepare for an important client meeting; failing to competently draft an email to a client; failing to effectively "draft a Statement of Work ("SOW")"; failing to attend an important client-meeting preparation call; and failing to use the correct form to draft an SOW.  (*Id.* ¶ 103–22.)  Plaintiff counters that he missed the important client-meeting preparation call because his son had a medical emergency.  (D.E. 48-29 ¶ 28.)

On October 2, 2019, Gibney contacted Tancredi, explained the issues she was having with Plaintiff's performance, and recommended terminating Plaintiff.  (D.E. 50-1 ¶ 124.)  After Tancredi agreed, Gibney memorialized the reasons undergirding her decision in an email to

Tancredi, and upper-level managers approved the termination of Plaintiff's employment. (*Id.* ¶¶ 126–27.) Tancredi and Gibney met with Plaintiff on October 4, 2019 and terminated his employment. (*Id.* ¶ 128; D.E. 48-29 ¶ 35.)

After Plaintiff was terminated from his position, Defendant did not hire a replacement. (D.E. 50-1 ¶ 131; D.E. 48-40 ¶ 131 ("admitted" by Plaintiff).) Instead, SMEs at the company "serviced the clients that had been assigned to Plaintiff [and] continued to do so as they had before—only without Client Manager support." (*Id.* ¶ 132.) Of the ten Client Managers who worked at Buck during the transition period in August 2018, four still work for the company as Client Managers, and "[t]wo of the four are older than [Plaintiff] (70 and 69, respectively)." (*Id.* ¶ 145.) Defendant involuntarily terminated one other Client Manager, "an individual 12 years younger than [Plaintiff]," who was laid off during "a reduction in force." (*Id.* ¶ 146.)

**B.     Procedural History**

Plaintiff initiated the instant suit on June 8, 2020, in the Superior Court of New Jersey, Law Division, Union County, and Defendant removed the case to this Court on September 8, 2020. (D.E. 1.) Plaintiff's Complaint alleges that Defendant violated the New Jersey Law Against Discrimination ("NJLAD") (Count One), and alleges additional, unknown entities may have violated the New Jersey Law Against Discrimination ("NJLAD") (Count Two). (*Id.* ¶¶ 1–23.) Following discovery, Defendant filed the instant Motion for Summary Judgment and briefing was timely completed. (D.E. 44, 48, 50.)[5]

---

[5] Plaintiff's opposition brief, (D.E. 48-2), falls woefully short of this Court's formatting requirements, including failing to have a table of contents and a table of authorities. *See* L.Civ.R. 7.2 (b)–(d). The brief also fails to adhere to basic brief composition: it does not contain a preliminary statement and fact section, and it does not include proper case and record citations. Plaintiff's counsel is cautioned going forward to review and comport with this Court's brief-formatting requirements and to adhere to the standard and basic formalities of brief composition.

## II. LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The dispute is not genuine if it merely involves "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the nonmoving party to carry its burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Once the moving party meets its initial burden, the burden then shifts to the nonmovant who must "set forth specific facts showing the existence of . . . an issue for trial." *Shields v. Zuccarini*, 254 F.3d 476, 481 (3d Cir. 2001) (citing FED. R. CIV. P. 56(e)). "In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence; instead, the non-moving party's evidence 'is to be believed and all justifiable inferences are to be drawn in his [or her] favor.'" *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (quoting *Anderson*, 477 U.S. at 255).

The nonmoving party "must present more than just 'bare assertions, conclusory allegations or suspicions' to show the existence of a genuine issue." *Podobnik v. U.S. Postal Serv.*, 409 F.3d 584, 594 (3d Cir. 2005) (quoting *Celotex Corp.*, 477 U.S. at 325). Further, the nonmoving party is required to "point to concrete evidence in the record [that] supports each essential element of its case." *Black Car Assistance Corp. v. New Jersey*, 351 F. Supp. 2d 284, 286 (D.N.J. 2004) (citing *Celotex Corp.*, 477 U.S. at 322–23)). If the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which . . . [it has] the burden of proof[,]" then the moving party is entitled to judgment as a matter of law. *Celotex Corp.*, 477 U.S. at 322–23. Furthermore, in deciding the merits of a party's motion for summary judgment, the court's role is not "to weigh the evidence and determine the truth of the matter[,] but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The nonmoving party cannot defeat summary judgment simply by asserting that certain evidence submitted by the moving party is not credible. *S.E.C. v. Antar*, 44 F. App'x 548, 554 (3d Cir. 2002) (citing *Schoonejongen v. Curtiss-Wright Corp.*, 143 F.3d 120, 130 (3d Cir. 1998)).

## III.  DISCUSSION

Under the NJLAD, employers are prohibited from discriminating against individuals with respect to compensation, terms, conditions, or privileges of employment, based on age. N.J. STAT. ANN. § 10:5-12(a). Courts evaluate summary judgment motions for "NJLAD claims under a specialized burden-shifting regime," which is largely based on the Supreme Court's decision in *McDonnell Douglas v. Green*."[6] *Ewell v. NBA Props.*, 94 F. Supp. 3d 612, 620 (D.N.J. 2015). Under *McDonnell Douglas*, (1) a plaintiff is "required to establish a prima facie case of discrimination"; then (2) if the plaintiff is successful, an inference of discrimination is created and

---

[6] 411 U.S. 792, 802 (1973).

9

the burden shifts to the defendant "to articulate a legitimate, nondiscriminatory reason for its adverse employment decision"; and then (3) if the defendant is successful, "the burden of production returns to the [plaintiff], who is then required to show that the employer's proffered reason was actually a pretext for discrimination." *Arenas*, 461 Fed. Appx. at 133.

In the first step of the *McDonnell-Douglas* framework,

> to make a prima facie case of age discrimination under the NJLAD, a plaintiff must demonstrate that [he or] she (1) is a member of the protected class, (2) was qualified for the position held, (3) suffered an adverse employment action, and (4) "ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination."

*Greco v. T-Mobile, USA*, No. 09-967, 2010 WL 4981264, at *10 (D.N.J. Dec. 1, 2010) (quoting *Monaco v. Am. Gen. Assurance Co.*, 359 F.3d 296, 300 (3d Cir. 2004)); *see also Nini v. Mercer Cnty. Cmty. Coll.*, 968 A.2d 739, 743 (N.J. Super. Ct. App. Div. 2009) *aff'd* 995 A.2d 1094 (2010) ("In the case of age discrimination, the fourth element 'require[s] a showing that the plaintiff was replaced with a candidate sufficiently younger to permit an inference of age discrimination." (quoting *Bergen Com. Bank v. Sisler*, 723 A.2d 944, 956 (1999))). A plaintiff must provide evidence sufficient to, at a minimum, "establish[] . . . an inference of unlawful discrimination." *Swider v. Ha-Lo Indus.*, 134 F. Supp. 2d 607, 621 (D.N.J. 2001) (citing *Fischer v. Allied Signal Corp.*, 974 F. Supp. 797, 805 (D.N.J. 1997)). If a plaintiff cannot provide sufficient evidence that an employer attempted to replace—or did replace—the plaintiff with another person who will perform the same work, the lack of evidence "precludes the required prima facie showing." *Erickson v. Marsh & McLennan Co.*, 569 A.2d 793, 800–01 (1990).

If a plaintiff establishes a prima facie case of discrimination by the defendant, in the second step of the *McDonnell-Douglas* framework the burden shifts to the defendant to "either show the reasonableness of the otherwise discriminatory act, or articulate a legitimate, non-discriminatory

reason or reasons for the employment action." *Swidler*, 124 F. Supp. 2d at 621 (citing *Maiorino v. Schering-Plough Corp.*, 695 A.2d 353, 364–65 (N.J. Super. Ct. App. Div.), *certif. denied*, 152 N.J. 189 (1997)). The burden is one of production, and the defendant "must clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection [that] would support a jury finding that unlawful discrimination was not the cause of the adverse employment action." *Id.* at 622 (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)). The defendant's burden, however, is "relatively light." *Arenas*, 461 Fed. Appx. at 133.

If the defendant meets the burden of production, in the third step of the *McDonnell-Douglas* framework the burden shifts back to the plaintiff, who must then "show that the employer's articulated reason was merely a pretext to mask the discrimination or that it was not the true motivating reason for the employer's action." *Id.* (citing *Kelly v. Bally's Grand, Inc.*, 667 A.2d 355, 359 (N.J. Super. Ct. App. Div. 1995)). To show that the reason was a pretext, the plaintiff can rely on direct or circumstantial evidence to (1) "discredit defendant's proffered reason," or (2) demonstrate "that discrimination was more likely than not a motivating or determinative factor in the adverse action." *Ewell*, 94 F. Supp. 3d at 620 (citing *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). If the plaintiff chooses the first method, he or she "must present evidence that allows a factfinder [to] 'reasonably to infer that each of the employer's proffered non-discriminatory reasons . . . was either a post[-]hoc fabrication or otherwise did not actually motivate the employment action . . . .'" *Id.* at 621 (second alteration in original) (quoting *Fuentes*, 32 F.3d at 764.) If the plaintiff chooses the second method, he or she may provide evidence that shows "that the employer in the past had subjected him [or her] to unlawful discriminatory treatment[;] that the employer treated other, similarly situated persons not of his [or her] protected class more

11

favorably[;] or that the employer has discriminated against other members of his [or her] protected class or other protected categories of persons." *Id.* (quoting *Fuentes*, 32 F.3d at 765).

### A. Prima Facie Case

When viewing the facts in the light most favorable to Plaintiff, he fails to establish the fourth element of a prima facie case against Defendant. Defendant does not contest the first three elements of Plaintiff's prima facie case, and the undisputed facts reflect that Plaintiff was 65 years old when the termination occurred and was therefore a member of a protected class; his lengthy employment history indicates that he was qualified; and he was terminated from his position, which constitutes an adverse employment action. (*See* D.E. 44-78 7–19, 23–25; D.E. 48-30; D.E. 48-31 ¶¶ 2–10.)

For the fourth element of a prima facie case, Plaintiff must establish that he "ultimately was replaced by a person sufficiently younger to permit an inference of age discrimination." *Greco*, 2010 WL 4981264, at *10 (quoting *Monaco*, 359 F.3d at 300). This element is where Plaintiff's prima facie case falters. Not only did Defendant *not* replace Plaintiff with a person sufficiently younger to constitute age discrimination, Defendant did not replace Plaintiff at all. (D.E. 50-1 ¶ 131; D.E. 48-40 ¶ 131.) Instead, SMEs at the company "serviced the clients that had been assigned to Plaintiff [and] continued to do so as they had before—only without Client Manager support." (*Id.* ¶ 132.) Plaintiff admits in his Response that he was not replaced, (D.E. 48-40 ¶ 131), and he further discusses it in his brief, noting that "[b]ecause [D]efendant did not replace [P]laintiff with another Client Manager that was younger, . . . a rigid application [of the fourth element] would leave [P]laintiff unable to satisfy the fourth prong of his prima facie case." (D.E. 48-42 at 13.) Relying on *Arenas v. L'Oreal USA Prods., Inc.*, 790 F. Supp. 2d 230 (D.N.J.

12

2011),[7] Plaintiff suggests that the fourth element should not be applied rigidly. (D.E. 48-42 at 13.) This reliance is unavailing because, while the Third Circuit affirmed *Arenas*, it also cautioned that courts should not 'ignore the rules laid out in *Monaco*," and confirmed that the fourth element, as delineated in *Monaco*, "applies in all age discrimination cases under the NJLAD." *Arenas v. L'Oreal USA Prods.*, 461 Fed. Appx. 131, 134 (3d Cir. 2012); *see also Monaco*, 359 F.3d at 300. Defendant did not replace Plaintiff with someone younger—and, moreover, did not replace him with anyone of any age. Plaintiff therefore fails to establish a prima facie case.

  **B**.  **Burden-Shifting Analysis**

While Plaintiff's claim cannot proceed because he cannot make out a prima facie case, in the interest of thoroughness this Court will discuss the remaining steps of the *McDonnell-Douglas* burden-shifting analysis.

If Plaintiff had established a prima facie case, an inference of discrimination would have been created, and Defendant would bear the burden of demonstrating the reasonableness of Plaintiff's termination or giving a legitimate, non-discriminatory explanation for the employment action. *See Swidler*, 124 F. Supp. 2d at 621 (citing *Maiorino v. Schering-Plough Corp.*, 695 A.2d 353, 364–65 (N.J. Super. Ct. App. Div.), *certif. denied*, 152 N.J. 189 (1997)). Here, Defendant has satisfied this burden in both ways. Defendant has submitted a plethora of evidence, including emails, internal evaluations, testimony, and declarations, (D.E. 44-2–44-76), and the sum and substance of the evidence supports Defendant's explanation that the termination was reasonable

---

[7] Counsel failed to give a citation to the *Arenas* case in this section of the argument and failed to note that there are two related published cases: one at the District Court level (may lend persuasive support to Plaintiff's argument), and a Third Circuit affirmation of the matter (does not lend persuasive support to Plaintiff's argument). Because the argument in Plaintiff's brief appears to relate to the analysis in the District Court matter, this Court will discuss the argument under that presumption. Counsel is again reminded to use proper citations in briefs.

and prompted by a legitimate, non-discriminatory reason.[8] Defendant alleges that Plaintiff had performance issues and did not meet Defendant's expectations. (*See* D.E. 50-1 ¶¶ 123–26.) Defendant has provided copious information that supports the contentions that the issues occurred over a considerable amount of time, that multiple emails from supervisors and co-workers addressed the issues, and that an internal performance review and performance plan documentation revealed that both Plaintiff and Defendant were aware of the issues. (D.E. 44-2–44-76.) The burden on Defendant to produce a non-discriminatory explanation or demonstrate that termination is reasonable is light, *see Arenas*, 461 Fed. Appx. at 133; here, however, the volume of evidence Defendant provided far exceeds its burden. Thus, Defendant would satisfy the second prong of the *McDonnell-Douglas* framework, if, that is, Plaintiff had established a prima facie case.

If the analysis were to proceed, Plaintiff would then have to meet the burden of demonstrating pretext under the *McDonnell Douglas* framework. To establish pretext, Plaintiff

---

[8] Plaintiff seeks to discredit Defendant's evidence by requesting that this Court employ the sham affidavit doctrine to adjudge Defendants' witness declarations incredible. (*See* D.E. 48-42 at 2–5.) The following is a description of the doctrine:

> That doctrine "refers to the trial courts' practice of disregarding an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior deposition testimony." *Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004); AFFIDAVIT, BLACK'S LAW DICTIONARY (11th ed., 2019) (stating that a sham affidavit is an "affidavit that contradicts clear testimony previously given by the same witness, [usually] used in an attempt to create an issue of fact in response to a motion for summary judgment.") To be covered by the sham affidavit doctrine, the affidavit testimony must actually *contradict* previous deposition testimony, not merely differ from it or be in tension with it. *SodexoMAGIC, LLC v. Drexel Univ.*, 24 F.4th 183, 210 (3d Cir. 2022) ("[T]he sham affidavit rule permits striking only contradictory statements in later-provided affidavits or declarations[.]"); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007) (referring to sham affidavits as "contradictory affidavits").

*Ramirez v. Lora and Guzman*, No. 18-11230, 2022 WL 1539176, at *8 (D.N.J. May 16, 2022). Here, Plaintiff does not point to any contradictory evidence in the declarations provided by Defendant, and instead cites two alleged examples of declarants at depositions not recalling information—information, however, that is not material to the matter. (*See* D.E. 48-42 at 2–5.) Plaintiff has not demonstrated that contradictory statements that are material to the matter exist in the declarations. The sham affidavit doctrine therefore is inapplicable. A blanket assertion that certain evidence submitted by the moving party is not credible does not defeat summary judgment. *See Antar*, 44 F. App'x at 554.

would have to either show that Defendant fabricated the reason for termination post-hoc or show that Defendant more likely than not intended to discriminate. *Ewell*, 94 F. Supp. 3d at 621 (citing *Fuentes*, 32 F.3d at 764–65). Plaintiff is unable to demonstrate pretext under either available theory.

First, Plaintiff cannot show that Defendant fabricated the reason for termination post hoc because Defendant provided multitudinous emails and documentation demonstrating that Plaintiff's supervisors made him aware of the performance issues at least five months prior to his termination, placed him on an improvement plan, and thoroughly documented the process. (*See* D.E. 44-2–44-76.) Plaintiff points to Gibney asking if he had plans to retire, (D.E. 48-29 ¶ 19), and discusses an email Gibney sent in which she mentioned Plaintiff saying that he was at the end of his career, (D.E. 48-29 ¶ 21), as evidence that Defendant's reason for termination was pretext. (D.E. 48-42 at 12–19.) Gibney denies asking Plaintiff if he intended to retire, (D.E. 50-1 ¶ 135), but viewing the evidence in a light most favorable to Plaintiff and assuming she did ask the question and make the comment, the question and the comment do not provide sufficient evidence of discrimination. The Third Circuit has recognized that a stray remark unrelated in time and context to an employee's termination does not provide sufficient evidence of discrimination. *Hyland v. Am. Int'l Group*, 360 Fed. Appx. 365, 367–68 (3d Cir. 2010) (finding that an employer referring to an employee as "the 'old man' of the operation" was a stray remark that was not sufficient evidence to demonstrate discrimination). The question and comment were temporally remote to Plaintiff's termination, and do not appear to offer significant contradiction to Defendant's otherwise overwhelming documentation of its explanation for Plaintiff's termination.

Second, Plaintiff contends that Defendant discriminated by terminating him because of his age, but has not demonstrated that Defendant more likely than not intended to discriminate by

doing so.  Specifically, the relative ages of Plaintiff's former co-workers is the coup de grâce to the argument.  Gibney, for example, is 60 years old, thus only a few years younger than Plaintiff.  (D.E. 50-1 ¶ 24.)  And, of the ten Client Managers who worked at Buck during the transition period in August 2018, four still work for the company as Client Managers, and "[t]wo of the four are older than [Plaintiff] (70 and 69, respectively)."  (*Id.* ¶ 145.)  Furthermore, after Plaintiff's termination, Defendant involuntarily terminated one other Client Manager, "an individual 12 years younger than [Plaintiff]," who was laid off during "a reduction in force."  (*Id.* ¶ 146.)  Plaintiff has not provided evidence that Defendant sought to dismiss employees based on age, considering other individuals who are similar in age or older than Plaintiff remain in the same position.  As such, Plaintiff would fail to demonstrate pretext, had Plaintiff established a prima facie case.

The NJLAD is designed to address insidious discrimination, including age discrimination.  It does not, however, provide a remedy for circumstances in which an employer terminates the position of an employee because it is no longer enamored with the employee's performance, and where that employee's performance has prompted an unfortunate obsolescence, as occurred in this matter.  Consequently, this Court finds summary judgment appropriate.

**IV.    CONCLUSION**

For the reasons set forth above, Defendants' Motion for Summary Judgment is **GRANTED**.  An appropriate order follows.

/s/ Susan D. Wigenton  
**SUSAN D. WIGENTON, U.S.D.J.**

Orig:       Clerk  
cc:          Leda D. Wettre, U.S.M.J.  
                Parties